*766 OPINION
By the Court,
Springer, J.:
The trial court entered summary judgment against appellant Jo Ann Allison and her son Thomas, who are suing the Merck pharmaceutical company (“Merck”) and the Clark County Health District (“Health District”) because they claim that a Merck-manufactured measles, mumps and rubella vaccine (the MMR II) administered by the Health District caused then seventeen-month-old Thomas to contract encephalitis and to suffer from consequent blindness, deafness, mental retardation and spastic contractures.[1] We conclude that Merck may be liable to Thomas Allison by reason of its strict liability as manufacturer if Thomas can prove that the vaccine in question is the cause of his disabilities.[2] In addition, we conclude that Merck may be liable to Thomas and Ms. Allison for failing to provide a proper warning *767 regarding the vaccine. Accordingly, we reverse the summary judgment in favor of Merck and remand to the trial court for a trial on Thomas’ strict liability claim and on Thomas’ and Ms. Allison’s failure-to-warn claims.[3]

STRICT LIABILITY

To establish liability under a strict tort liability theory, Thomas must establish that his injury “was caused by a defect in the product, and that such defect existed when the product left the hands of the defendant.” Shoshone Coca-Cola Co. v. Dolinski, 82 Nev. 439, 443, 420 P.2d 855, 858 (1966). In this case, whether any defect in the vaccine that might have caused Thomas’s disabilities was present “when the product left the hands of the defendants]” is not a matter of controversy; so, if the Allisons can prove that Thomas’ encephalitis “was caused by a defect in the product,” then plaintiffs should be able to recover from Merck.
We have already considered the meaning of the word “defect” in connection with strict products liability. In Ginnis v. Mapes Hotel Corp., we adopted a definition of “defect” that is still useful and applicable to the case at hand: “ ‘Although the definitions of the term “defect” in the context of products liability law use varying language, all of them rest upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function.’ ” 86 Nev. 408, 413, 470 P.2d 135, 138 (1970) (quoting Dunham v. Vaughn & Bushnell Mfg. Co., 247 N.E.2d 401, 403 (Ill. 1969)). If Thomas can establish that the vaccine caused him to suffer permanent brain damage, then surely the vaccine failed to perform in the manner reasonably to be expected “in light of [its] nature and intended function.” The nature and intended function of this vaccine, of course, is to create an immunity to measles, mumps and rubella without attendant blindness, deafness, mental retardation and permanent brain damage.[4]
Under the law of strict liability in this state, responsibility for injuries caused by defective products is properly fixed wherever it will most effectively reduce the hazards to life and health inherent *768 in defective products that reach the market. Although manufacturers are not insurers of their products, where injury is caused by a defective product, responsibility is placed upon the manufacturer and the distributor of the defective product rather than on the injured consumer. See Stackiewicz v. Nissan Motor Corp., 100 Nev. 443, 448, 686 P.2d 925, 928 (1984); see also Nat’l Union Fire Ins. v. Pratt and Whitney, 107 Nev. 535, 815 P.2d 601 (1991).
In Stackiewicz, we allowed a strict liability case to go to the jury on the plaintiff’s claim of an idiopathic steering defect in an automobile which the plaintiff claimed was the cause of her injuries. We said in Stackiewicz that when “‘machinery “malfunctions,” it obviously lacks fitness regardless of the cause of the malfunction.’” Id. at 448-49, 686 P.2d at 928 (quoting Lindsay v. McDonnell Douglas Aircraft Corp., 460 F.2d 631, 639 (8th Cir. 1972)). In the case before us, plaintiffs are claiming in effect that the vaccine “malfunctioned”; and, if we are to follow Stackiewicz, then a vaccine which causes permanent brain damage “obviously lacks fitness regardless of the cause of the malfunction.”[5] If the vaccine is found by a factfinder to have caused Thomas to develop the disabling encephalitis, then Merck’s “‘“sin” is the lack of fitness as evidenced by the malfunction itself rather than some specific dereliction by the manufacturer.’” Id. at 449, 686 P.2d at 928 (quoting Lindsay, 460 F.2d at 639).
*769 Unless we are going to abandon long-standing public policy grounds for holding manufacturers and distributors of defective products responsible for injuries caused by manufactured products that prove to be defective, Thomas must be given an opportunity to prove that a malfunctioning vaccine caused his injuries, just as we allowed Ms. Stackiewicz to try to prove that her injuries were caused by a defective steering mechanism. The public policy considerations that support holding the defendants liable in this case (if plaintiffs can prove that the vaccine caused his injuries) were put well by Professor Prosser in the noted law review article, “The Fall of the Citadel”:
The public interest in human safety requires the maximum possible protection for the user of the product, and those best able to afford it are the suppliers of the chattel. By placing their goods upon the market, the suppliers represent to the public that they are suitable and safe for use; and by packaging, advertising and otherwise, they do everything they can to induce that belief ....
50 Minn. L. Rev. 791, 799 (1966). This concept of “public interest” is the guiding principle of our present opinion.
If we are going to follow Shoshone Coca-Cola and Stackiewicz, we must send this case back to the trial court. A vaccine that causes blindness and deafness is a defective product. Causation is a factor yet to be determined by a factfinder.[6]

“UNAVOIDABLY UNSAFE”?

Merck claims that it is free from strict manufacturer’s liability by virtue of the dictum stated in comment k to section 402A of the Restatement (Second) of Torts.[7] This comment suggests that a *770 drug manufacturer should not be held liable for “the unfortunate consequences attending” the use of its drugs if: (1) the manufacturer supplies “the public with an apparently useful and desirable product, attended by a known but apparently reasonable risk,” (2) the drug is “properly prepared and marketed,” and (3) “proper warning is given.”
It is not easy to divine just why the framers of the comment thought that a drug manufacturer should be excused in cases in which it manufactured a drug that was “known” to be dangerous. The whole idea behind strict tort liability is that the manufacturer, not the consumer, should bear the responsibility for injuries, even when the product is ostensibly properly prepared and marketed and when the plaintiff is not in a position to prove the origin of the defect.[8] See Stackiewicz, 100 Nev. at 443, 686 P.2d at 925.
What the question in this case really gets down to is whether an exception should be made in a case in which a drug manufacturer injures a consumer with a drug that it knows is dangerous, but not too (“unreasonably”) dangerous. That is to say, should a drug manufacturer be allowed to profit with impunity from the distri *771 bution of a drug that it knows is capable of resulting in physical injury, so long as the drug can somehow be certified as not being unreasonably dangerous? We answer that question in the negative and say that a drug manufacturer should, under the strict liability jurisprudence of this state, be held liable in tort even when the drug is “properly prepared and marketed” (that is to say, non-negligently) and even when the known danger inherent in the drug may be what the comment calls “reasonable.”
The apparent rationale of comment k in relieving drug manufacturers from liability is that where the manufacturer is free from fault, that is to say it produces a product that is unsafe because of a claim by the manufacturer that it is “incapable of being made safe,” the manufacturer should not be responsible for injuries resulting from use of the drug. The comment itself gives as an example of such an “unavoidably unsafe” drug the Pasteur treatment of rabies “which not uncommonly leads to very serious and damaging consequences when it is injected.” We would note, however, that the reason why serious and damaging consequences of the Pasteur rabies treatment do not result in tort liability is not because of the “unreasonably dangerous” doctrine proposed by comment k, but, rather, because the victim chooses to be injected with a drug having known “damaging consequences” rather than to die from rabies. It is the voluntary choice to take the antirabies serum that eliminates tort liability and not the serum’s being said to be unavoidably or reasonably dangerous. There is no need to make an exception to the rules of strict liability such as that suggested by comment k in the rabies example because the rabies victim waives tort claims by accepting what the victim knows to be the necessary risk involved in the treatment.[9]
Speaking of “unavoidable” danger or fault-free infliction of harm, or speaking of reasonable (and therefore acceptable) risk of harm, is very much alien to strict liability theory and should have no place in the Restatement provisions relating to strict *772 liability. Mixing concepts of fault-free (“unavoidable”) manufacture and “reasonable risk” into the context of non-negligent, strict liability is entirely inconsistent with our products liability cases and with the law established in this state for almost thirty years. The well-accepted principle supporting our products liability cases is expressed in comment c of section 402A of the Restatement:
[P]ublic policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.
It could not be said any more clearly than this. Merck, not Thomas Allison, must, if the Merck product did in fact cause Thomas’ overwhelming misfortune, bear the “burden of the accidental [intended] injuries caused by products intended for consumption.” Restatement (Second) of Torts, § 402A, cmt. c (1965).
The Dissent and Merck urge that the imposition of liability on Merck for Thomas’ injuries in this case would act as a deterrent to necessary and beneficial research and development of new drugs. The Dissent and Merck appear to be arguing that if Merck were to be held liable for statistically infrequent injuries such as the one at bar, society would be the worse because Merck and other drug manufacturers would be fearful and retarded in the development of new and greatly needed immunological products. If Merck were to have to pay for what its vaccine has done to Thomas, this would, Merck says, necessarily inhibit the development and marketing of immunological products which are helpful to many and “unfortunately” devastating to others.
Although, on policy grounds, Merck might talk some legislative body into immunizing it from liability, it would be certainly inappropriate for the court to make such a radical change in our well-established products liability law. Further, one would think that if a legislature were going to give such special benefits to drug manufacturers, most certainly the resultant legislation, to be just, would have to afford some kind of compensation or relief to the victims of “unavoidably unsafe” drugs. If, for example, a legislature provided that automobile manufacturers would be held to a standard of strict liability for manufacturing defects, even if injuries caused by a given defect are statistically infrequent and perhaps “unavoidable,” and at the same time immunized drug *773 manufacturers from liability for injuries caused by their vaccines, the legislature would, as mentioned, very probably and properly include in such discriminatory legislation some kind of no-fault victim compensation plan to set off the advantage given to drug manufacturers over other kinds of manufacturers.[10]
In summary, this court cannot, under our law, read comment k as giving immunity to liability in cases such as the present one. It would be in harmony with our cases if comment k were read to mean that when drug consumers know of a danger and decide to accept the risk because of hoped-for benefits, strict tort liability cannot fairly attach to the dispenser of such a drug; however, insofar as comment k might be read as justifying release from liability of manufacturers and distributors of “reasonably dangerous” vaccines that are administered throughout our population and read as placing the burden of loss on the consumer, we must reject any such interpretation. It must be remembered that these inoculation programs are nationwide and that those who are required to take the vaccines have little or no choice as to whether to take them or not. We see no public policy need for changing our law or for shifting from the drug manufacturers to the consumer/victim the responsibility for all of the “unfortunate consequences” suffered by the Allisons of the world. If this kind of reallocation of resources is to be made, it is properly a legislative rather than a judicial function to do so. Considerable research and legislative committee activity would be necessary before an intelligent and informed judgment could be made as to whether we should leave “unfortunate” victims of drug injury to their own resources and free drug manufacturers from tort liability, on the unsubstantiated pretext that such a drastic measure is necessary in order to encourage drug research and development.

*774
STRICT TORT LIABILITY MAY BE IMPOSED EVEN IF MERCK’S INTERPRETATION OF COMMENT K WERE ACCEPTED

This court rejects the idea of freeing drug manufacturers from liability for defective drugs simply because they claim that the drugs are reasonably or unavoidably dangerous. However, even if, like the dissenting justice, we were to accept Merck’s interpretation of comment k in this case, Thomas and his mother would still be entitled to a trial. A factfinder could find in this case that the product here, if not defective or dangerous “per se,” was “unreasonably dangerous as marketed.” Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1273 (5th Cir. 1974). Reyes noted that “[i]n terms of the user’s interests, a product is ‘unreasonably dangerous’ only when it is ‘dangerous to an extent beyond that contemplated by the ordinary consumer.’"[11] Id. (quoting Restatement (Second) of Torts § 402Acmt. i (1965)). Citing to comment k, the Reyes court thus held that even an “unavoidably” unsafe vaccine may be defective if marketed without an adequate warning. Id. at 1274-78. Accordingly, under the Reyes rationale, even under the broadly exculpatory interpretation of comment k espoused by Merck, liability cannot be avoided by a drug manufacturer and distributor in the marketing of a vaccine unless the vaccine is “accompanied by proper directions and warning.” Id. at 1274 (quoting Restatement (Second) of Torts § 402A cmt. k (1965)).[12]
*775 It would appear that a factfinder in this case could reasonably conclude that the vaccine given to Thomas Allison was not accompanied by a proper warning.[13] Although Merck does not admit that this vaccine can cause disastrous central nervous system disorders, it announces in its MMR II package circular (which is not distributed to vaccinees) that “significant central nervous system reactions such as encephalitis and encephalopathy occurring within 30 days after vaccination, have been temporally associated with measles vaccine approximately once for every million doses.” (Emphasis added.) In dealing with the mass consumers of the vaccine, the Health District revised this information when it issued its “Important Information” (not a “Warning”) flyer prepared by the Center for Disease Control (“CDC”). The “Important Information” flyer is a revision of Merck’s package circular, and it contains a much less dissuading statement, namely, that, “[ajlthough experts are not sure,” there might be a very remote possibility — a chance in a million — that takers of the vaccine “may have a more serious reaction, such as inflammation of the brain (encephalitis).” The gist of the faulty warning aspect of liability in this case is that none of the prospective vacinees was warned of the actual possibility of permanent brain damage. Rashes, yes; sore throats, yes; “inflammation of the brain,” yes; but permanent blindness, deafness, and mental retardation, no.[14]
Further, there is evidence in the record that Merck underestimated the incidence of serious central nervous system involve *776 ment caused by or “temporally associated with” the vaccine.[15] Whether the incidence data be true or not, the information that was ultimately conveyed to Jo Ann Allison could be seen by a factfinder as being slanted and insufficient; and the only information that was actually made available to Ms. Allison was that there was a one in one million [not four in one million] chance that her son “may” have a more serious reaction to the vaccine “such as inflammation of the brain.” At no time was Ms. Allison ever made aware that the vaccine might result in her son’s becoming an invalid. Accordingly, there is certainly an issue of fact as to whether the warning in this case was “proper”; and, in fact, there appears to be substantial evidence in this case from which a jury could find that the vaccine in question was not “‘accompanied by proper directions and warning,’” Reyes 498 F.2d at 1274 (quoting Restatement (Second) of Torts § 402A cmt. k (1965)), especially when that evidence is viewed in the favorable light required on appeal from summary judgment. Consequently, even if we were to accept Merck’s version of comment k, the Allisons would still be entitled to a trial on the merits.[16]

*777
MERCK’S CLAIMED CONTRACTUAL DELEGATION OF ITS DUTY TO WARN

Merck claims that since it contracted with the government to provide the necessary warnings to accompany this vaccine, the government, and not Merck, should be liable for any faults in the warning process. As stated above, a jury would be justified in finding that the warnings ultimately given to the consumers were inadequate. Merck wants to be relieved of any responsibility for these faulty warnings because it contracted-out its duty to warn of the dangers inherent in this vaccine.
Merck claims in its brief that it did not participate in the preparation of the “Important Information” form, but does not deny knowing of its contents. Merck puts the “legal question in this case” to be “whether it was negligent for Merck to rely on the Center for Disease Control — the foremost authority in the world on the subject.” A jury could definitely conclude that the answer to this question is, “yes.” Almost anyone who reads the Important Information handout should be able to see immediately that it does not warn of the possible risks of blindness, deafness and permanent brain damage. As discussed in the preceding section, a jury could find that the warning given was inadequate and that Merck knew that the warning that was being promulgated with its vaccine was inadequate. This fact accompanied by Merck’s admitted knowledge of the Center for Disease Control’s bias and concern “that manufacturers would overwarn of the risk of the vaccine,” {see footnote 16) tells us that a jury could have properly found that Merck was marketing a substance which it knew was (albeit, “unavoidably”) “unsafe,” and did so knowing that the accompanying written warnings were inadequate. Thus a jury could reasonably conclude that Merck was negligent in purveying this dangerous vaccine when it was unaccompanied by an adequate warning.[17]
*778 The only question here, as we see it, is whether Merck can free itself from any liability simply by delegating that duty and by contracting out that duty to a third party — in this case the Center for Disease Control. There are two lines of cases on the question-of whether a manufacturer can absolve itself of strict liability by delegating its duty of due care to warn of the dangers of a supposedly “unavoidably unsafe” drug. In Mazur v. Merck & Co., Inc., cited by Merck, the Third Circuit Court held that it was permissible for a manufacturer to abdicate its responsibility and turn it over to the CDC, provided that the manufacturer (Merck) did not misinform or mislead the CDC. 964 F.2d 1348, 1368 (3d Cir.), cert. denied, ...... U.S. ......., 113 S.Ct. 463 (1992); see also Davis v. Wyeth Laboratories, Inc., 399 F.2d 121 (9th Cir. 1968).
The other, better view is expressed in Petty v. United States, 740 F.2d 1428 (8th Cir. 1984). Petty is right on point here. Petty involved a manufacturer’s failure to warn of risks associated with the swine flu vaccine. The court held:
We recognize that the government has attempted to statutorily assume [sic] the duty to warn the vaccinees, however, we do not find that this delegation thereby relieves the manufacturer from liability for any resulting inadequacy of the warning. The duty is imposed on the manufacturer and in a mass-immunization context, ... the duty extends to the ultimate recipient of the vaccine. Delegation of the duty does not, in itself, relieve the manufacturer of its obligation, nor should it insulate the manufacturer from liability for deficiencies in the manner in which the chosen intermediary effectuates the manufacturers duty. Although on the sidelines, Merrill-National [drug company] is assumed to have had die knowledge of the warning issued and to have had the ability to affect the warning.
Id. at 1440; see also In re Jones, 804 F.2d 1133, 1139 (10th Cir. 1986) (attempt to limit contractually strict liability for product defects void as against public policy).
Since failure to give proper warning, under all legal theories, renders a product “defective,” we conclude that although a *779 manufacturer may decide to assign its duty to warn of the unsafeness of its product to others, a manufacturer cannot be relieved of ultimate responsibility for assuring that its unsafe product is dispensed with a proper warning. Although there is authority to go either way, it seems to us to be far the better rule that Merck should not be allowed to walk away, on summary judgment, from its duty to warn users of the dangers of its vaccine, especially when there is evidence from which a jury could find that the warning actually given was faulty.

GOVERNMENT CONTRACTOR DEFENSE

Merck also argues that the so-called “government contractor defense” operates in this case to relieve it of any liability to the Allisons. This defense is very ill-defined, and we see no justification for applying it to this case. Generally speaking, the defense has been made available to a manufacturer who contracts to produce a military product for the federal government. The idea is that sovereign immunity should be extended to private contractors acting pursuant to and in conformance with a government contract for military equipment. If such contractors can show that the government approved reasonably precise specifications for the product, that the specifications were followed, and that the manufacturer warned the government of dangers known to the manufacturer but not to the government, then, the government contractor defense may be successfully interposed. Boyle v. United Technologies, 487 U.S. 500 (1988). The requirements necessary to this defense do not fit very nicely into the present case.
Almost all of the cases relating to the government contractor defense are military cases in which the government has told the manufacturer how to make the product. A good example is a case involving a helicopter which the government designed so that the door would open outward. A man drowned when his helicopter went underwater, and the water pressure on the door prevented his escape. Obviously, the manufacturer should not be held responsible, because the government designed the door. See id. [Headnotes 18, 19]
Merck cites to cases which expand the defense and principally to Boruski v. United States, 803 F.2d 1421 (7th Cir. 1986). Merck was a defendant in that case, which involved the swine flu vaccine. Boruski points out that the “common application of the doctrine has been to military cases,” but goes on to quote approvingly from Burgess v. Colorado Serum Co., 772 F.2d 844, 846 (11th Cir. 1985), in which it was said:
*780 “Both the history of the defense and its general rationale lead us to the conclusion that it would be illogical to limit the availability of the defense solely to ‘military’ contractors. If a contractor has acted in the sovereign’s stead and can prove the elements of the defense, then he should not be denied the extension of sovereign immunity that is the government contract defense.”
Boruski, 803 F.2d at 1430. Even if we were inclined to follow Boruski and apply the defense to drug cases, there is a serious question of fact in this case as to whether Merck was acting in the sovereign’s stead. It would appear that it was not. The extent to which the government may have provided precise designs and specifications for this vaccine is certainly a matter that is up to question.[18]
In Nielson v. George Diamond Vogel Paint Co., 892 F.2d 1450 (9th Cir. 1990), a civilian employee of the Army Corps of Engineers painted a dam in Idaho over a period of several years, using a certain type of paint. Id. at 1451. The employee was diagnosed as suffering from brain damage as a result of inhaling the toxic paint fumes. Nielson brought suit against two paint manufacturers, alleging strict liability for manufacturing defect, inadequate warnings and negligent production. In denying the government contractor defense, the Ninth Circuit Court stated: “We do not read Boyle to establish the broad immunity for all government procurement contractors urged by the defendants . . . "Id. The Ninth Circuit Court observed that the “underlying premise” of the defense was not limited to the military context, but that contractors are not, in reliance on Boyle, to be broadly immunized from their own negligence. Id. at 1455. The Ninth Circuit Court further noted that “the policy behind the defense remains rooted in considerations peculiar to the military,” id. at 1454-55, and that the reasons for shielding government contractors from liability are “peculiar to the military field,” id. at 1454. Noting Justice Scalia’s reasoning in Boyle, the court stated that the defense is most applicable where there is a need to “[avoid] scrutiny of sensitive military decisions, as, for example, the design of a fighter plane.” Id. Of course, no such concerns apply here. See also In re Hawaii Federal Asbestos Cases, 715 F. Supp. 298, 300 (D. Hawaii 1988) (“the Boyle opinion applies only to military equipment”), aff’d, 960 F.2d 806 (9th Cir. 1992).
*781 We find no case, including Boruski, that would lead us to relieve Merck from liability by reason of the government contractor defense.

FEDERAL PREEMPTION

As mentioned previously, four years after Thomas suffered his injuries, the United States Congress enacted the “National Childhood Vaccine Injury Act of 1986.” This Act provides for limited compensation by the federal government for injured vaccinees who had civil actions pending at the time the Act was passed, provided the injured vaccinee was willing to dismiss the pending litigation. See 42 U.S.C. §§ 300aa-11(5A), 300aa-15(b) (Supp. 1992). The Act does not require litigants to dismiss their lawsuits; rather, it permits litigants to “elect” to forestall pending tort claims and to accept the limited largesse offered by the government. Id. These tort claimants’ decisions not to pursue claims under the National Childhood Vaccine Injury Act do not preclude them from pursuing their tort claims if they elect to do so. Certainly the Act contains no express language which would preempt the Allison’s tort actions.

CONCLUSION

Viewing the facts in the light most favorable to the Allisons, Thomas is entitled under Nevada law to pursue an action against Merck under a strict tort liability theory. Also, it appears that the Allisons did not receive fair warning as to the vaccine’s true danger and that they never had any real choice as to whether Thomas Allison was to be vaccinated. Comment k cannot:be invoked to exculpate Merck from strict tort liability, and this case can be distinguished from the kinds of cases represented in the rabies example relied upon in comment k. It is one thing to proffer a medicine to a prospective user, saying: “You have a pernicious disease. We have a medicine that has serious side effects, even, possibly, blindness and deafness. You make the choice.” It is quite another thing to say: “You must have your son vaccinated or he cannot go to school. Your son might get a rash or, on ‘one out of a million’ odds, might get a ‘brain inflammation.’” In the first case, the user’s knowing acceptance of the risks frees the purveyor of liability. In the second case, the traditional public policy behind strict product liability comes into play. Ms. Allison did not and could not have bargained for this misfortune. She had no real choice. “[T]he burden of accidental injuries caused by products intended for consumption [must] be placed upon those who market them.” Restatement (Second) of Torts, § 402A, cmt. c (1965).
*782 In summary, if we apply the principles of product liability law that have been in effect in this state since Shoshone Coca-Cola Co. v. Dolinski, 82 Nev. 439, 420 P.2d 855 (1966), Thomas Allison is entitled to try to prove to a factfinder that the vaccine caused his disabilities and that the vaccine was defective and unsafe, because, under Ginnis v. Mapes Hotel Corp., 86 Nev. 408, 470 P.2d 135 (1970), the vaccine failed to perform in the manner reasonably to be expected of a vaccine. Further, even if we were, as some courts apparently have done, to accept the exculpatory, “unavoidably unsafe” interpretation of comment k, it is quite clear that there is a jury issue in this case as to whether the vaccine was “safe as marketed,” that is to say whether it was marketed with an adequate warning.
We reverse the summary judgment in favor of Merck on Thomas Allison’s strict liability claim and on Thomas’ and Ms. Allison’s failure-to-warn claims and remand for trial. We affirm the judgment in all other respects.

 We affirm the summary judgment in favor of Clark County Health District. The Health District is not a “seller of products.” Accordingly, it cannot be liable under either a warranty or a strict liability theory. See NRS 104.2313-2315; Restatement (Second) of Torts § 402A (1965). Further, there is no issue of fact remaining with respect to the Health District’s failure to warn because the Allisons’ own expert testified that although the CDC warning utilized by the Health District was inadequate, the Health District met the relevant standard of care by using that warning. Therefore, the district court’s entry of summary judgment on the Allisons’ failure-to-warn causes of action was also appropriate.

 Ms. Allison made a strict liability claim for relief on her own behalf as well, but it was struck as barred by the applicable statute of limitations.

 A number of different kinds of legal claims have been asserted by the Allisons against Merck, but the only theories that we see as having any merit are those of strict tort liability and failure to warn.

 Indeed, Merck seems to concede that the vaccine was defective, albeit “unavoidably” so. See discussion infra at page 769.

 The Dissent suggests this opinion is “reminiscent not of strict liability but rather res ipsa loquitur. ...” We are not exactly sure what is meant by this, given that res ipsa loquitur is a method of proof whereas strict liability is a theory of recovery. We do note, however, that Stackiewicz does stand for the proposition that plaintiffs may rely on a res ipsa loquitur type of inference to meet their burden of establishing a defect in strict liability cases; as stated above, in Stackiewicz, we held that evidence of a steering malfunction was sufficient circumstantial evidence of a defect or “unreasonably dangerous condition” to support a judgment based on strict product liability in favor of the plaintiff. We also would note that the approach this court took in Stackiewicz is not exceptional. Several courts have held that plaintiffs may rely on circumstantial evidence to establish a product defect. See e.g., Lindsay v. McDonnell Douglas Aircraft Co., 460 F.2d 631 (8th Cir. 1972), on remand 352 F. Supp 633, (D.C.), affirmed 485 F.2d 1288 (8th Cir. 1973) (new navy jet caught on fire and crashed into ocean — court held that the fire was evidence of a malfunction which in turn was evidence of some defect); Kileen v. General Motors Corp., 421 A.2d 874 (Con. Super. 1980); Lee v. Crookston Coca-Cola Bottling Company, 188 N.W.2d 426 (Minn. Sup. Ct. 1971); Jagmin v. Simonds, Abrasive Co., 211 N.W.2d 810 (Wis. 1973). In this case, we merely hold that proof that the MMRII vaccine caused Thomas Allison’s injuries is sufficient circumstantial evidence to raise a genuine issue of material fact and allow the issue of product defect to go to the jury.

 Merck defends on the ground that these kinds of disasters occur only rarely, perhaps only once in a million times; but this disputed allegation is immaterial, as it was immaterial in Stackiewicz whether there was a low or high incidence of idiopathic steering disorders in Nissan cars. If we are going to subscribe to the basic rationale of strict tort liability set out above and to adhere to our ruling in the Stackiewicz case, then we must, again, if causation can be proved, allow Thomas to recover for the “cost of the injury” and the “overwhelming misfortune” that has befallen him.

Comment k, section 402A, Restatement (Second) of Torts (1965) provides as follows:
k. Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to *770 very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he [she] has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.
(Emphasis added.)

 “Properly prepared and marketed” means to me simply that the injured consumer is unable to prove that the manufacturer was guilty of negligence. This should not be able to defeat a strict liability action. “Proper warning” is a subject apart and is akin to informed consent. If a consumer uses a dangerous product after having been fairly and properly warned of its dangers, we are really not talking about strict liability at all. See discussion of comment k and voluntary use of dangerous drugs below.

 Obviously, the situation in mass immunization projects is quite different from the emergency, voluntarily accepted treatment of rabies cases. Ms. Allison never had any real choice as to whether her son was to receive the vaccine in question. Not only was she, let us say, “strongly encouraged” to make the decision to go ahead with her child’s vaccination, she was faced with the Hobson’s choice of either having the vaccine administered or not having the privilege of sending her son to private or public school. See NRS 392.435; NRS 394.192. Choosing not to have her son attend school, of course, would have subjected her to criminal penalties unless she had the means to have her son educated at home. NRS 392.200-.210. Even if the Allisons could be seen to have been properly warned of the risk inherent in this vaccine, it is hard to conclude that they freely accepted the risk of the horrible injuries resulting in this case.

 In fact, four years after Thomas suffered his injuries, the United States Congress enacted the “National Childhood Vaccine Injury Act of 1986.” This Act provides for compensation by the federal government to individuals who have sustained vaccine-related injuries after the effective date of the Act, and limits vaccine manufacturers’ liability for vaccine-related injuries sustained after the effective date of the Act. 42 U.S.C. § 300aa-15(a) (1988); 42 U.S.C. § 300aa-l 1(a)(2)(A) (Supp. 1992). The Act also provides for somewhat more limited compensation for injured vaccinees who had civil actions pending at the time the Act was passed, if the injured vaccinees elect to dismiss their pending civil actions. 42 U.S.C. § 300aa-15(b) (Supp. 1992). The Act does not apply to this case as the Allisons did not elect to dismiss their civil action and proceed under the Act, as was their right. In the absence of federal law preemption or state legislative exculpation of drug manufacturers, there is no reason to depart from our existing strict liability jurisprudence. (The National Childhood Vaccine Injury Act is discussed further infra at page 781.)

 We find it very difficult to understand what dangerous to an extent beyond that contemplated by the ordinary consumer means. Does it mean that out of the millions of consumers of this vaccine we must search for the prototypical, “ordinary” consumer and ask if that consumer “contemplated” the vaccine to be dangerous? If the expression has any intelligible meaning at all, it is certainly a retreat from traditional products liability principles and a move toward a negligence standard in which the consumer’s choice is measured on the basis of what a reasonable and “ordinary” consumer would do under the circumstances. The more we look at the hodgepodge created by the Restatement (Second) of Torts in the area of consumer rights, the more comfortable we feel with following our precedent and the traditional principles of strict liability.

 There is also evidence in this case from which a factfinder could conclude that Merck is tortiously liable to the Allisons, under our state common law, for intentional or negligent underwarning of its product. See, e.g., Oak Grove Inv. v. Bell & Gossett Co., 99 Nev. 616, 624, 668 P.2d 1075, 1080 (1983) (“a failure to warn may be a product defect”); Davidson v. Velsicol Chemical Corp., 108 Nev. 591, 592, 834 P.2d 931, 932 (1992), cert. denied, ...... U.S. ....., 113 S. Ct. 1944 (1993). This rule is consistent with comment j to section 402A, which establishes liability for failure to warn where the seller “has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge of . . . the danger.” Restatement (Second) of Torts § 402A cmt. i (1965). Numerous *775 courts and commentators agree that this theory is properly applied to the makers of prescription drugs. See, e.g., Basko v. Sterling Drug, Inc., 416 F.2d 417, 426 (2d Cir. 1969); Woodill v. Parke Davis & Co., 402 N.E.2d 194, 197-99 (Ill. 1980); Moore v. Vanderloo, 386 N.W.2d 108, 116 (Iowa 1986); John A. Kidwell, The Duty to Warn: A Description of the Model of Decision, 53 Tex. L. Rev. 1375, 1395 (1975); Comment, William R. Murray, Jr., Requiring Omniscience: The Duty to Warn of Scientifically Undiscoverable Product Defects, 71 Geo. L.J. 1635, 1638-39 (1983); Note, Kathleen H. Wilson, The Liability of Pharmaceutical Manufacturers for Unforeseen Adverse Drug Reactions, 48 Fordham L. Rev. 735, 752-53 (1980).

 Merck denies any responsibility for underwarning this product, claiming that it contractually delegated its duty to warn to the federal government. This claim is discussed infra at page 777.

 The Dissent states that this opinion “asserts that the faulty warning aspect of liability in this case is that no prospective vaccinees were warned of the actual possibility of permanent brain damage.” This is not accurate. The crux of this whole section is that the question of the adequacy of the warning given in this case is one for the trier of fact to determine, not this court. It is up to the jury to determine how “vast” a warning must be and “[a]t what point” the line should be drawn. See Dissenting Opinion at page 791.

 There is considerable controversy in this case as to whether encephalitis and disabling brain damage is caused by (or “temporally associated” with) use of the vaccine one in one million times or four in one million times, or more, or less. The incidence of catastrophic sequelae of the vaccine is disputed; still, we cannot see how it would make the slightest bit of difference to Ms. Allison in accepting the vaccination whether the chances that her son would be brain damaged were one in one million or four in one million or ten or twenty in a million. She was not told that the kind of injury suffered by her son was even a possibility. The only information that she might have had (assuming that she read the two page information sheet furnished to her by the Health District) was this “blurb”:
Although experts are not sure, it seem (sic), that about 1 out of a million children who get measles or mumps vaccines may have a more serious reaction, such as inflammation of the brain (encephalitis).
Whether one out of a million or four out of a million children, or more children “have a more serious reaction, such as inflammation of the brain,” is not of any great consequence unless Ms. Allison had been informed that inflammation of the brain might mean deafness, blindness, mental retardation and permanent brain damage.

 The Dissent asserts that another reason why summary judgment is appropriate in this case is the applicability of the so-called “learned intermediary defense.” The Dissent concludes that the “mass immunization” exception to this defense does not apply in this case, even though Thomas received his vaccination at a clinic without a physician, because “[h]ad Mrs. Allison chosen not to go to CCHD for the vaccination, Dr. Potter, in all probability, would have administered the MMR II vaccine.” This is pure speculation. At any rate, we do not believe that Dr. Potter’s advice to Ms. Allison that “it was time” for Thomas to receive his MMR II vaccine is the type of individualized medical judgment contemplated by the learned intermediary defense. The fact is the Health District, not Dr. Potter, administered the MMR II vaccine. Accordingly, the mass immunization exception does apply to this case.

One possible explanation why no proper warnings were given to the Allisons or other vaccinees is revealed in the affidavit of Dr. Dull, which has been olfered by Merck. Dr. Dull is a retired Center for Disease Control physician, who testified that the CDC had a policy of offering to prepare product information sheets for vaccines because the government feared that otherwise “vaccine manufacturers would overwarn potential vaccinees and thus discourage the use of vaccines.” Given the CDC’s admitted biases against “discouragfing] the use of vaccines,” a jury could conclude that Merck knew or had reason to know that the CDC was not going to provide the truth about Merck’s product and did not, in fact, give proper warning. If a jury were to conclude that Merck had such knowledge, Merck should not, in fairness, be allowed to insulate itself from tort liability simply by saying that it contracted with the CDC to take over all of Merck’s responsibility for warning about its “unavoidably unsafe” product. If Merck decided to let the *778 CDC go fast and easy on the warnings in order that people would not be reluctant to take the Merck-manufactured vaccines, Merck, while accepting the financial gain, should not be freed from financial responsibility for the untoward consequences suffered by the Allisons by reason of Thomas’ taking the vaccine, especially in light of the possibility that Merck fully realized how inadequate the warning really was.

 Unlike the Dissent, we do not accept Merck’s claim that the fact that the government has considered “every ‘design feature’ relating to MMRII” is at all dispositive of this issue. Certainly mere government consideration of design specifications or even government approval of such specifications does not as a matter of law immunize manufacturers from liability.