ROBIN LEWIS, TERESA RAE WEBB AND TRICIA MARIE GASSE, APPELLANTS, *v.* SEA RAY BOATS, INC., A TENNESSEE CORPORATION, RESPONDENT.

No. 36831

March 21, 2003                                                65 P.3d 245

[Rehearing denied May 9, 2003]

---

*Beckley Singleton, Chtd.,* and *Daniel F. Polsenberg* and *Rex A. Jemison,* Las Vegas, for Appellant Lewis.

*Frank C. Cook,* Las Vegas, for Appellants Webb and Gasse.

*Parnell & Associates* and *Christian E. Hardigree* and *Richard B. Parnell,* Las Vegas; *Snell & Wilmer* and *Alex Marconi,* Phoenix, Arizona, for Respondent.

Before the Court En Banc.

## OPINION

By the Court, MAUPIN, J.:

Leo Gasse was killed and Robin Lewis catastrophically injured due to carbon monoxide poisoning during an overnight outing in a Sea Ray pleasure boat at the Lake Mead National Recreation Area. Lewis, along with Gasse's heirs, Teresa Rae Webb and Tricia Marie Gasse, brought suit against Sea Ray Boats, Inc., alleging that Sea Ray is strictly liable in tort in connection with the incident. A jury returned a verdict in favor of Sea Ray, finding that the boat was not a defective or unreasonably dangerous product. This appeal followed.

Appellants' primary contention centers on the district court's failure to adopt appellants' proffered instructions on their theory of liability; that warnings concerning the risk of carbon monoxide migration secondary to use of the boat's air conditioning system were inadequate. Because we conclude that appellants were entitled to more specific instructions with regard to the warnings issue, we reverse the district court's judgment and remand this matter for a new trial.

### FACTS

In May 1991, Leo Gasse and Jimmy Paxson purchased a used Sea Ray pleasure boat from a Las Vegas area Sea Ray dealership. In addition to gasoline propulsion engines, the boat contained a small gasoline generator, which powered the boat's accessories, including the air conditioner.

On May 29, 1993, during a weekend cruise on Lake Mead, Gasse and Lewis "side-tied" the boat to a beach and went to sleep in the boat's cabin, leaving the gasoline generator running to power the air conditioner. The next morning, Anthony Caro, Jr., a friend who was staying at the beach, knocked on the cabin door and received no response. He returned later that afternoon, boarded the boat, and found Gasse dead and Lewis barely breathing. Mr. Caro testified that the engines were not running when he first checked on the couple and when he returned.

Subsequent investigation confirmed that the generator, rather than the engines, was the source of the carbon monoxide, a tasteless odorless gas. This proposition was bolstered by other trial tes-

timony that, had engine exhaust been the source, the couple may have been able to detect the problem because of the distinctive odor of exhaust fumes.

Two warnings regarding carbon monoxide poisoning accompanied the sale of this type of boat in 1981, one written by ONAN, the generator manufacturer,[1] and the other by the National Marine Manufacturers' Association (NMMA).[2] Sea Ray provided boat purchasers with an assortment of other manuals, none of which are relevant to this case. Both warnings primarily addressed the danger of carbon monoxide exposure from engine exhaust.

When Gasse and Paxson purchased the boat, the Sea Ray dealership service manager, George Schenk, and the salesman, Curt Snouffer, warned of the danger of exhaust fumes and carbon monoxide, and the necessity of ventilating the boat to remove hazardous fumes. Schenk and Snouffer demonstrated this process by opening a window and the hatch to allow for flow-through ventilation, and explained the need to have the rear door remain open when running the main propulsion engines. Lastly, Schenk indicated that idling the engine with the front hatch closed could cause accumulations of carbon monoxide.

Appellants theorized that a process described as "migrating carbon monoxide" caused the accident. The process occurs when carbon monoxide, although safely exhausted from the boat's gasoline generator into the open air, is blown back into the boat by wind, entering the passenger cabin through small openings. Sea Ray's ex-

---

[1] The warning states:

WARNING

ENGINE EXHAUST GAS (CARBON MONOXIDE) IS DEADLY!

Carbon monoxide is an odorless, colorless gas formed by incomplete combustion of hydrocarbon fuels. Carbon Monoxide is a dangerous gas that can cause unconsciousness and is potentially lethal. Some of the symptoms or signs of carbon monoxide inhalation are:

- Dizziness                    – Vomiting
- Intense Headache             – Muscular Twitching
- Weakness and Sleepiness      – Throbbing in Temples

If you experience any of the above symptoms, get out into fresh air immediately. The best protection against carbon monoxide inhalation is a regular inspection of the complete exhaust system. If you notice a change in the sound or appearance of the exhaust system, shut the unit down immediately and have it inspected and repaired at once by a competent mechanic.

[2] The warning states:

**WARNING:** Use care in running the engine continuously when the boat is closed up in bad weather, particularly when the boat is not in motion. Exhaust fumes and carbon monoxide may accumulate in the passenger areas, so be alert to any indication that exhaust fumes are present, and ventilate accordingly.

pert agreed with this theory of causation, but noted that such a phenomenon is quite rare and for carbon monoxide to accumulate to dangerous levels, passenger cabin ventilation must have been obstructed.

Sea Ray's expert testified regarding the safety of sleeping with the air conditioner running. He admitted that although boaters will often sleep with the air conditioner running unless warned not to do so, certain precautions should be taken. These include: (1) posting a watch, since in 1981, the year the boat was manufactured, no carbon monoxide detection devices were available; (2) anchoring the boat from the bow rather than the side, so that any wind currents would blow away from the stern; or (3) creating flow-through ventilation before going to sleep. The expert conceded that Sea Ray's manual contained no such instructions or warnings, but stressed that no incidents of this type resulting in death had ever been reported in connection with the particular pleasure boat model involved in this case. Sea Ray's expert also voiced his opinion that the warnings given were adequate with regard to carbon monoxide exposure, and that the risk of "migrating" carbon monoxide from on-board generators was not a known hazard when the boat was originally purchased in 1981.

Sea Ray's expert additionally relied upon a Nevada Department of Wildlife booklet found on the boat after the incident. The booklet discussed the hazards of exhaust fumes, warned that carbon monoxide itself is tasteless and odorless, that plenty of air flow should be maintained because exhaust fumes can blow back into a boat when running downwind, and that adequate ventilation was required when using catalytic heaters for warmth.

The warnings that are the subject of this appeal specifically addressed the danger of carbon monoxide exposure from exhaust fumes, generally addressed dangers attendant to carbon monoxide exposure, and only inferentially addressed dangers in connection with generator fumes. All of this is important because, as noted, the discrete odor from engine exhaust would arguably alert the passengers to the presence of noxious fumes, while emissions from the generator probably would not.

*Jury instructions on "adequate warning"*

Appellants submitted a proposed jury instruction regarding legal requirements for an "adequate warning" based on *Pavlides v. Galveston Yacht Basin, Inc.,*[3] a Fifth Circuit case applying a three-factor test under Texas law[4] for determining whether a product warning was adequate. The proposed instruction read as follows:

[3]727 F.2d 330 (5th Cir. 1984).

[4]*See Bituminous Casualty Corp. v. Black & Decker Mfg. Co.,* 518 S.W.2d 868, 872-73 (Tex. Civ. App. 1974).

> A warning must (1) be designed so it can reasonably be expected to catch the attention of the consumer; (2) be comprehensible and give a fair indication of the specific risks involved with the product; and (3) be of an intensity justified by the magnitude of the risk.

The district court rejected this proposed instruction and instead gave the following two instructions:

First:

> Although you are to consider only the evidence in the case in reaching a verdict, you must bring to the consideration of the evidence your everyday common sense and judgment as reasonable men and women. Thus, you are not limited solely to what you see and hear as the witnesses testify. You may draw reasonable inferences from the evidence which you feel are justified in the light of common experience, keeping in mind that such inferences should not be based on speculation or guess.

Second:

> The question of whether or not a given warning is legally sufficient depends upon the language used and the impression that such language is calculated to make upon the mind of the average user of the product.

The first instruction is a stock instruction that the jury should simply use its common sense in evaluating and drawing inferences from the evidence introduced at trial. The second instruction is generally worded, containing partial excerpts from *Pavlides*.[5]

During deliberations, the jury sent a note to the trial judge, requesting a definition of an "adequate warning." Appellants proposed an instruction taken from a products liability treatise to the district court.[6] The district court rejected this instruction, as well as again rejecting appellants' proposed *Pavlides* instruction. Consequently, the district court simply reread the two instructions it had previously given on the issue to the jury.

After the trial judge reread the instructions, the jury foreman informed the judge that the reading did not assist the jury in its delib-

---

[5]*Pavlides*, 727 F.2d at 338 (citing *Bituminous Casualty Corp.*, 518 S.W.2d at 873).

[6]The instruction defining "adequate warning" offered by appellants stated:

> To be adequate a necessary warning by its size, location, and intensity of language or symbol, must be calculated to impress upon a reasonably prudent user of the product the nature and extent of the hazard involved. The language used must be direct and should, where applicable, describe the method of safe use.

erations. The district court again sought a definition of "adequate warning" from the parties. Appellants reoffered the treatise definition, arguing that it was essentially consistent with Nevada case authority.[7] The district court again rejected the treatise definition, and refused to instruct the jury further, despite the confusion. Soon after the rereading of the jury instructions, one juror was replaced during deliberations for unspecified reasons. Shortly thereafter, the jury returned a verdict in favor of Sea Ray. This appeal followed.

## DISCUSSION

*Failure to give appellants' proposed "adequacy of warnings" instruction*

Respondent contends that warnings instructions in cases such as this one should be generally worded and that the adequacy of warnings should be left to the common sense of the finder of facts. Appellants contend that the district court erred by not instructing the jury with their more specific definition of "adequate warning." We agree with appellants.

In *American Casualty Co. v. Propane Sales & Service,* we held that a party is entitled to have the jury instructed on all of his theories of the case that are supported by the evidence,[8] and that general, abstract or stock instructions on the law are insufficient if a proper request for a specific instruction on an important point has been duly proffered to the court.[9] We reversed in *American Casualty Co.* because the jury was left to guess "from general 'stock' instructions" discrete elements of proof "in the rather unusual context of a gas explosion case."[10] However, in *American Casualty Co.,* we also observed that "[i]n some instances a requested instruction, although proper, will not be essential to the jury's understanding of the case."[11]

---

[7]*See Outboard Marine Corp. v. Schupbach,* 93 Nev. 158, 561 P.2d 450 (1977); *see also Fyssakis v. Knight Equipment Corp.,* 108 Nev. 212, 826 P.2d 570 (1992).

[8]89 Nev. 398, 400, 513 P.2d 1226, 1227 (1973); *cf. Singleton v. State,* 90 Nev. 216, 220, 522 P.2d 1221, 1223 (1974) (holding that "[a]n instruction need not be given when there is no proof in the record to support it").

[9]89 Nev. at 400, 513 P.2d at 1227; *see also Dixon v. Ahern,* 19 Nev. 422, 429, 14 P. 598, 601 (1887) (stating that a party is " 'entitled to have specific charges upon the law applicable to each of the hypotheses or combinations of facts which the jury, from the evidence, might legitimately find' " (quoting *Sword v. Keith,* 31 Mich. 247, 255 (1875))).

[10]89 Nev. at 401, 513 P.2d at 1228.

[11]*Id.; see also Jones v. Viking Freight System,* 101 Nev. 275, 701 P.2d 745 (1985).

Under Nevada law,[12] "strict liability may be imposed even though the product is faultlessly made if it was unreasonably dangerous to place the product in the hands of the user without suitable and adequate warning concerning safe and proper use."[13] Inherent in this doctrine is that "a product must include a warning that adequately communicates the dangers that may result from its use or foreseeable misuse."[14] More particularly, in *Fyssakis v. Knight Equipment Corp.*, we held that adequacy of warnings was an issue of fact for the jury where an industrial strength soap manufacturer's warnings did not alert the user that the soap could cause blindness.[15] In *Allison v. Merck and Company*,[16] a district court entered summary judgment in favor of a manufacturer of a childrens vaccine. We reversed in light of our conclusion that the drug manufacturer was required to adequately warn parents of possible side effects of immunization, including blindness, deafness or mental retardation. Accordingly, we held that a general warning that an inoculated child could encounter rashes and possible brain inflammation was arguably inadequate and issues of fact remained as to the sufficiency of the warnings given.[17] In remanding the *Allison* case for trial on the adequacy of the warnings, we rejected the notion that a drug manufacturer could, via a general warning, avoid liability as a matter of law, even where the product was either reasonably or unavoidably unsafe.[18]

In the instant matter, the purchasers of the boat were comprehensively warned about the dangers of carbon monoxide poisoning from exhaust fumes, fumes characterized by a distinctive odor. Here, however, the injuries sustained by Gasse and Lewis were not caused by exhaust fumes; they were caused by odorless and tasteless carbon monoxide fumes from the generator that

---

[12]Because we have determined, *infra,* that this case does not implicate maritime jurisdiction, we rely on Nevada decisional authority in resolving the warnings issues presented in this appeal.

[13]*Outboard Marine Corp.,* 93 Nev. at 162, 561 P.2d at 453 (citing *General Electric Co. v. Bush,* 88 Nev. 360, 498 P.2d 366 (1972)).

[14]*Fyssakis,* 108 Nev. at 214, 826 P.2d at 571-72.

[15]*Id.*

[16]110 Nev. 762, 878 P.2d 948 (1994).

[17]*Id.* at 774-76, 878 P.2d at 956-58.

[18]*Id.* In *Allison,* we also remanded the matter for trial on the basic causation issue of whether the child's brain damage was caused by the serum. *Id.* at 782, 878 P.2d at 961.

powered the boat's air conditioner. Whether the warnings described above, which generally addressed dangers and symptoms of carbon monoxide poisoning and specifically addressed carbon monoxide exposure secondary to engine exhaust and running the heater, sufficiently apprised Gasse and his co-owner of carbon monoxide poisoning from use of the air conditioner remained the primary issue of fact throughout the trial below. Thus, the text of the ''warnings'' instruction became critical to the jury's fact-finding mission.

Here, the district court's ''warnings'' instructions provided very little in the way of guidance, other than to generally state that whether a warning is legally sufficient depends upon the ''impression'' that the warnings language ''is calculated to make upon the mind of the average user of the product,'' and that the jury should use its common sense in resolving the issue. This instruction was not sufficient to assist the jury in resolving the liability issues based upon Sea Ray's alleged failure to warn. First, in *Fyssakis* and *Allison,* we refused to exonerate products manufacturers as a matter of law from strict tort liability based upon general warnings language. Second, these instructions left lay jurors, persons in much the same position as the users of the product at issue, to search their imaginations to test the adequacy of the warnings. Third, given that experts testified in this case to the nature and quality of the warnings that were given and their supposed behavioral impact, the jurors were entitled to more specific guidance as to the law governing the duty to warn in connection with consumer products.

We therefore embrace the rule of law stated in the *Pavlides* instructions offered by appellants below, and hold that Nevada trial courts should advise juries that warnings in the context of products liability claims must be (1) designed to reasonably catch the consumer's attention, (2) that the language be comprehensible and give a fair indication of the specific risks attendant to use of the product, and (3) that warnings be of sufficient intensity justified by the magnitude of the risk.

The district court's failure to instruct the jury as suggested by appellants mandates reversal for a new trial.

*Applicable law to be applied on remand*

Appellants argue that the district court improperly applied admiralty law instead of Nevada law to the proceedings below. We agree.

In *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,[19] the United States Supreme Court established a two-part "location" and "connection" test for determining when the exercise of federal maritime jurisdiction is appropriate.[20] Under the "location" leg of this test, a court must determine whether "the tort occurred on navigable water or . . . [the] injury suffered on land was caused by a vessel on navigable water."[21] Although the location prong of the test is satisfied in this instance, the "connection" prong is not. One feature of the "connection" test requires an analysis of the general features of the incident causing the injury to determine whether the incident has " 'a potentially disruptive impact on maritime commerce.' "[22]

We conclude that the incident in question here had no potential for disruption of maritime commerce on the Lake Mead Reservoir. Gasse and Lewis were occupants of a single pleasure boat moored in an isolated location at night. Thus, there is no basis to apply admiralty law to this controversy in lieu of Nevada law.[23]

## CONCLUSION

The district court's warnings instructions merely admonished the jury to use its common sense in resolving the sufficiency of the warnings, guided only by a general and partial definition of "adequate warning" under *Pavlides*. Although *Fyssakis* and *Allison* do

---

[19]513 U.S. 527 (1995).

[20]*Id.* at 531-32 (dealing with admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim).

[21]*Id.* at 534 (citing 46 U.S.C. App. § 740).

[22]*Id.* (quoting *Sisson v. Ruby,* 497 U.S. 358, 364 n.2 (1990)). The connection test has two subtests that must be satisfied. The second subtest requires a court to examine whether the general character of the incident causing the injury "shows a 'substantial relationship to traditional maritime activity.' " *Id.* (quoting *Sisson,* 497 U.S. at 365, 364 n.2). It is unnecessary for us to reach this second subtest, given our conclusion that this matter does not present a set of facts depicting a potentially disruptive impact on maritime commerce. *See Christensen v. Georgia-Pacific Corp.,* 279 F.3d 807, 814 (9th Cir. 2002) ("To create a maritime tort, the incident must have occurred on navigable waters and have a maritime flavor. An incident has maritime flavor if it has a potentially disruptive impact on maritime commerce *and* a substantial relationship to traditional maritime activity." (footnote omitted and emphasis added)).

[23]*See H2O Houseboat Vacations Inc. v. Hernandez,* 103 F.3d 914 (9th Cir. 1996) (holding that emission of carbon monoxide injuring family members on a single pleasure boat, where there was no danger to other vessels, did not invoke maritime jurisdiction under the "disruptive impact" test); *cf. Sisson,* 497 U.S. at 360, 367 (holding that a fire in a marina in navigable waters had a potential for disruption of maritime commerce).

not delineate how juries are to be instructed on this issue, when read together with *American Casualty Co.,* they impliedly require a more specific instruction on the adequacy of warnings than given here. Under our adoption of the *Pavlides* instruction, appellants are entitled to have their instruction on the definition of "adequate warning" submitted to the jury. That the jury ultimately became engaged in a dialogue with the district court on this very issue, and that the jury foreman indicated repetition of prior instructions was not helpful to the jury's deliberations, underscores the insufficiency of the instructions that were given.

We therefore reverse the judgment of the district court and remand this matter for new trial proceedings[24] conducted in accordance with this opinion.[25]

AGOSTI, C. J., SHEARING, ROSE and LEAVITT, JJ., and YOUNG, Sr. J., concur.

---

[24]Appellants also take issue with the district court's instructions on changed conditions and superseding cause. The district court should revisit these instructions on remand depending on whether evidence introduced supports them. *See Singleton,* 90 Nev. at 220, 522 P.2d at 1223. Because of our ruling with regard to the warnings instructions, we need not reach appellants' arguments concerning the practice of filing ex-parte trial briefs pursuant to EDCR 7.27.

[25]THE HONORABLE NANCY BECKER, Justice, voluntarily recused herself from participation in the decision of this matter.

THE HONORABLE CLIFF YOUNG, Senior Justice, having participated in the oral argument and deliberations of this matter as a Justice of the Nevada Supreme Court, was assigned to participate in the determination of this appeal following his retirement. Nev. Const. art. 6, § 19; SCR 10. THE HONORABLE MARK GIBBONS, Justice, did not participate in the decision of this matter.