Wanda FISHER; Scott Fisher; and Brandy Fisher, Plaintiffs,

v.

PROFESSIONAL COMPOUNDING CENTERS OF AMERICA, INC., a foreign corporation; Alfa Chemicals Italiana, a foreign corporation; Sagran, a foreign corporation; CPS, Inc., a California corporation; and HBS, Inc., a California corporation, Defendants.

No. CVS011031PMPPAL.

United States District Court, D. Nevada.

March 29, 2004.

Will Kemp, Esq., Harrision, Kemp & Jones, Chtd., Las Vegas, NV, Counsel for Plaintiffs.

Steve Morris, Esq., Margaret L. Sanner, Esq., Jenny Sullivan Parker, Esq., Morris Pickering & Sanner, Las Vegas, NV, Counsel for Defendant Alfa Chemicals Italiana.

Carrie McCrea Hanlon, Esq., Pyatt Silvestri & Hanlon, Las Vegas, NV, Counsel for Defendant Professional Compounding Centers.

### ORDER

PRO, Chief Judge.

Presently before the Court are two motions for summary judgment filed on behalf of Defendants Professional Compounding Centers of America, Inc. ("PCCA") (Doc. # 188) and Alfa Chemicals Italiana ("Alfa") (Docs.# 189, 190), both filed on September 29, 2003. Alfa filed an Errata (Doc. # 194) on October 3, 2003. PCCA filed an Opposition to Alfa's motion for summary judgment (Doc. # 201) on October 17, 2003. Plaintiffs filed a joint Opposition to PCCA and Alfa's motions (Docs.# 196, 197) on October 15, 2003. Plaintiffs filed an Addendum to their Opposition (Doc. # 204) on October 20, 2003, and four Supplements (Docs.# 212, 238, 253, 256) on November 4, 2003, January 8, 2004, March 15, 2004, and March 17, 2004. PCCA filed a Reply (Doc. # 206) on October 27, 2003. Alfa filed a Reply to PCCA's Opposition to Alfa's motion for summary judgment (Doc. # 208) on October 28, 2003. Alfa also filed a Reply to Plaintiffs' Opposition (Doc. # 214) on November 5, 2003. Alfa filed an Errata to this Reply (Doc. # 216) on November 6, 2003. PCCA filed a Supplement to its motion for summary judgment (Doc. # 234) on January 7, 2004. Finally, Alfa filed a Supplement to its Reply (Doc. # 255) on March 17, 2004. The Court held a hearing on the above motions on March 17, 2004.

## I. BACKGROUND

Plaintiffs Wanda Fisher and her husband Scott Fisher bring this suit for damages arising out of Wanda's consumption of the diet drug fen/phen, a compound of two drugs, fenfluramine and phentermine. (Notice of Removal [Doc. # 3], Ex. A; Exs. to Pls.' Opp'n to Alfa and Def. PCCA Motions for Summ. J. [hereinafter "Exs. to Pls.' Opp'n"], Ex. 2 at 15.) Wanda and Scott Fisher, and their daughter Brandy, were living in Utah when they went to a physician named Dr. James Brinton in the spring of 1997. (Exs. to Mot. for Summ. J. of Def. Alfa ["Exs. to Alfa's Mot."], Ex. S at 70, Ex. T at 52–53.) Dr. Brinton, a Utah licensed physician, was a gynecologist·who began to offer weight loss drugs in 1996, after learning about fen/phen and its effectiveness for both long and short term weight loss. (Def. PCCA's Mot. for Summ. J. ["PCCA's Mot."], Ex. A at 6, 15.) At the time Dr. Brinton first began prescribing fen/phen, he prescribed the fenfluramine and phentermine separately, and consequently his patients had to take a total of four pills daily. (*Id.* at 107–08.) Dr. Brinton subsequently learned that it was possible for patients to take only one pill per day if they obtained the pill from a compounding pharmacist who would combine the fenfluramine and phentermine with a time release agent. (*Id.* at 118–20.)

Dr. Brinton suggested his patients obtain the compounded pill at Stewart's Pharmacy, operated by pharmacist Stewart Koeven, located across the street from

Dr. Brinton's office in Provo, Utah. (*Id.* at 107–08, 118–19.) Wanda obtained the once-a-day fen/phen pill from Stewart's pharmacy. (Def. Alfa's Reply in Supp. of Mot. for Summ. J., Ex. I at 191; Exs. to Alfa's Mot., Ex. T at 68, 75.) She consumed most of the pills in Utah over a period of three months, although occasionally she may have taken one when she was visiting her husband in Mesquite, Nevada where he worked, and where they planned to move. (Exs. to Alfa's Mot., Ex. S at 86–102, Ex. T at 8–9; Exs. to Pls.' Opp'n, Exs. 9–12.)

In July 1997, the Food and Drug Administration ("FDA") issued a Public Health Advisory which recommended close monitoring of patients who had taken fen/phen for more than three months. (PCCA's Mot., Ex. C.) In August and September 1997, major producers of fenfluramine and phentermine, including Wyeth–Ayerst Laboratories and Medeva Pharmaceuticals, announced they were withdrawing their weight loss drugs from the market due to the apparent relationship between the drugs and valvular heart disease. (*Id.*, Ex. D.) In response to these developments and other warnings about fenfluramine's association with heart problems, Dr. Brinton shut down his weight loss practice. (Exs. to Pls.' Opp'n, Ex. 23 at 136, 155–56.)

In 1998, Wanda noticed some symptoms, including pressure in her chest, shortness of breath, heart "fluttering," and intermittent swelling in her feet. (Alfa's Reply, Ex. N at 23.) She did not consult with a physician until after she saw an advertisement for a clinic by Utah lawyers regarding heart problems associated with fen/phen use. (PCCA's Reply, Ex. A at 106.) Wand visited Dr. Kolda, a Utah physician, in March 2001 for a physical examination based on her prior fen/phen use. During this exam, Dr. Kolda performed an echocardiogram. (*Id.*; PCCA's Mot., Ex. F at 25.) Wanda subsequently visited Dr. Channick, a California physician, in May 2001. (PCCA's Mot., Ex. F at 25.) Dr. Channick diagnosed Wanda with primary pulmonary hypertension ("PPH"). (*Id.*) PPH causes fibrosis in pulmonary arteries, thereby preventing oxygenation of the blood, restricting blood flow, and increasing blood pressure. In response, the heart works harder to pump blood through the body. As the heart works harder, it becomes more muscular and enlarges, eventually leading to heart failure and death. (Supplement to Pls.' Opp'n [Doc. # 212], Ex. 1 at 6–7.) Shortly after Dr. Channick diagnosed Wanda with PPH, the Fishers brought suit against those in the distribution chain of the fenfluramine contained in the drug compound Wanda used. (Notice of Removal [Doc. # 3], Ex. A.)

Defendant Alfa is an Italian company which formerly owned a subsidiary named Industria Chimica Farmeceutica Italiana ("ICFI"). (Exs. to Alfa's Mot., Ex. A at 5–9.) ICFI produced in bulk the active pharmaceutical ingredient fenfluramine at a plant in Italy. (*Id.* at 12–13, 22.) Alfa distributed the fenfluramine to five companies in the United States for research and development purposes only, not for consumer use. (Exs. to Alfa's Mot., Ex. B at 93.) It is undisputed that none of this fenfluramine reached the U.S. consumer market or Wanda Fisher.

Unrelated to these research and development sales, Alfa sold several kilograms of fenfluramine to an exporter named Gino Messeca. (Exs. to Alfa's Mot., Ex. L at 8.) Alfa knew the fenfluramine sold to Messeca was to be exported from Italy and that it was intended for human consumption. (Exs. to Pls.' Opp'n, Ex. 4 at 50.) But Alfa claims it did not know the fenfluramine would reach America. Rather, Alfa claims it did not give Messeca key documents he would need to import the fenfluramine into the United States under FDA and customs

regulations so that Messeca could not import Alfa's fenfluramine into the U.S. absent some violation of U.S. law. (Exs. to Alfa's Mot., Ex. C at 21, 45.)

Plaintiffs contend ICFI and Alfa "unofficially" knew the fenfluramine was destined for the U.S. When questioned on this subject, Messeca offered rather ambiguous testimony, stating that Alfa did not "officially" or "unofficially" know. When pressed on the point, Messeca conceded Alfa might have known, in part because Alfa was "not stupid" and could have surmised from the quantity Messeca ordered that the fenfluramine was headed to the U.S.[1]

Messeca sold the fenfluramine to two U.S. companies, Defendants CPS and HBS. (Exs. to Alfa's Mot., Ex. L at 7, 31.) CPS and HBS passed the fenfluramine on to Defendant PCCA. (Errata to Alfa's Mot. for Summ. J. [Doc. # 194], Ex. K at 107–08.) Alfa claims Messeca and PCCA conspired to illegally bring the fenfluramine into the United States without Alfa's participation or knowledge. At the time the fenfluramine was imported, FDA had prohibited PCCA from importing any foreign chemicals because of a prior violation; PCCA had imported chemicals marked for research and development only and sold them to consumers without proper labeling. (Exs. to Pls.' Opp'n, Ex. I.) FDA also banned Messeca's company TopChem from importing bulk chemicals into the U.S. (Exs. to Pls.' Opp'n, Ex. M.) Despite these prohibitions, according to Messeca, he used a company named Sagran to purchase the fenfluramine and sold the fenfluramine to CPS and HBS even though he knew PCCA was the entity ultimately ordering and purchasing it. (Exs. to Alfa's Mot., Ex. L at 6–8, 66–72.) As a result, Alfa contends Messeca and PCCA were able to circumvent FDA prohibitions against TopChem and PCCA's importation of foreign bulk chemicals.

After acquiring the fenfluramine, PCCA repackaged the bulk fenfluramine into smaller packages. (Exs. to Pls.' Opp'n, Ex. 2 at 12.) PCCA then sent out those smaller quantities to compounding pharmacists, such as Koeven at Stewart's Pharmacy, for incorporation into fen/phen one-

---

1. Messeca's deposition testimony was as follows:

Q. Yes. Now did—you've said that ICFI and Alfa knew it was for export. Did they know which countries it could possibly be going to?
A. No. No. Maybe they knew about it, but officially they might not have known.
Q. But unofficially did you let Mr. Cavalli know that some of it was going to the United States?
A. No, no, no, no. . . . . In this case, frankly speaking, I think he did not know I was sending it to the United States. Officially he did not know.
Q. Did he know that unofficially?
A. I don't think so.
(Exs. to Pls.' Opp'n, Ex. 4 at 50–51.) Later in the deposition, Messeca had this to say on the subject:
Q. Did [Cavalli] know unofficially or have an idea some materials were going to the United States?
A. According to the quantities, maybe yes. But officially he did not know and should not have known.
. . .
Q. Okay. But given the quantities of this material, he had an idea that it may be going to the United States, is that what you said?
A. Maybe, maybe, maybe, maybe.
. . .
Q. But I'm not talking about officially, I'm not talking about on the record, I'm talking about if Mr. Cavalli knew off the record, that some this, maybe 25 kilograms was going to the United States.
. . .
A. Yes, I heard you. Yes. Maybe yes, maybe no.
Q. Why would you think maybe yes?
A. Because. Because Mr. Cavalli is not stupid.
(Id. at 89–92.)

a-day pills. (*Id.* at 14, 70.) PCCA supplied pharmacists such as Koeven with instructions or recipes on compounding fen/phen, as well as a compounding machine. (*Id.* at 14, 16, 19, 36, 84.) Koeven then would combine the ingredients and place them in the compounding machine thus producing a fen/phen pill. (*Id.* at 15–16.)

Plaintiffs sued Alfa, PCCA, Sagran, CPS and HBS for strict products liability failure to warn (count 1), strict products liability design defect (count 2), negligence (count 3), breach of implied warranty (count 4), fraudulent concealment (count 5), and negligent misrepresentation (count 6). Defendants Alfa and PCCA move for summary judgment. Alfa argues this Court has no personal jurisdiction over it. Alfa and PCCA both argue Utah law, rather than Nevada law, applies. PCCA argues the statute of limitations has run. Both Alfa and PCCA argue the unavoidably unsafe product, bulk supplier, and learned intermediary doctrines shield them from liability in this case. Alfa also argues it is entitled to summary judgment on the merits of Plaintiff's negligence, breach of implied warranty, fraudulent concealment, and negligent misrepresentation claims.

## II. PERSONAL JURISDICTION OVER DEFENDANT ALFA

Alfa is an Italian company with no offices, employees, sales agents, real property, or bank accounts in Nevada. Alfa has had various U.S. distributors, none of which have been located in Nevada. Alfa employees have not visited Nevada for any business purpose. Alfa authorized sales of fenfluramine in the U.S. to five non-Nevada jurisdictions: Arizona, New York, Minnesota, New Jersey, and Puerto Rico. The fenfluramine produced by Alfa that Wanda ingested reached the U.S. through the Messeca/PCCA importation, but that fenfluramine was shipped to Koeven's pharmacy in Utah, not Nevada.

On the basis of these facts, Alfa claims this Court has no personal jurisdiction over it. Plaintiffs contend that due to Alfa's continuous and systematic marketing of drugs to the U.S., the Court has general jurisdiction over it. Plaintiffs also contend Alfa knew "unofficially" of the Messeca/PCCA scheme, and therefore purposefully directed its activities at the U.S. and Nevada such that the Court has specific jurisdiction over Alfa.

■ Where no applicable federal statute governs personal jurisdiction, the Court must use the long-arm statutes of the state in which it sits. *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir.2003). Nevada's long-arm statutes allow courts to exercise personal jurisdiction over defendants to the extent permitted by the Due Process Clause of the United States Constitution. Nev.Rev.Stat. 14.065(1) ("A court of this state may exercise jurisdiction over a party to a civil action on any basis not inconsistent with the constitution of this state or the Constitution of the United States.").[2] Because Nevada exercises jurisdiction to the extent permitted by the Constitution, the Court need only determine whether

---

2. Nevada has a special products liability service of process statute which provides:

Any company, firm, partnership, corporation or association created and existing under the laws of any other state, territory, foreign government or the Government of the United States, which manufactures, produces, makes, markets or otherwise supplies directly or indirectly any product for distribution, sale or use in this state may be lawfully served with any legal process in any action to recover damages for an injury to a person or property resulting from such distribution, sale or use in this state by mailing to the last known address ... a copy of the summons and a copy of the complaint.

Nev.Rev.Stat. 14.080(1).

personal jurisdiction in this case would meet the requirements of due process. *Harris Rutsky*, 328 F.3d at 1129.

■ Due process requires that in order to subject a defendant not present within the forum to personal jurisdiction, he must have " 'certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' " *Id.* (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The Court may exercise either specific or general personal jurisdiction.

### A. Specific Jurisdiction

To determine whether the Court can exercise specific jurisdiction over Alfa, the Court applies a three-part test: (1) the non-resident defendant must purposefully direct his activities toward the forum state or perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must be reasonable. *Id.* The Ninth Circuit has adopted a "but for" test to determine whether the injury arises from the forum activity. *Id.* at 1131–32.

■ Under the "but for" test, Plaintiffs claims do not arise out of or relate to Alfa's activities in Nevada. Therefore, the Court does not have specific personal jurisdiction over Alfa. Even accepting as true Plaintiffs' theory that Alfa purposefully directed its fenfluramine to the United States through the Messeca/PCCA importation, Plaintiffs' claims arise out of Alfa's activities in Utah, not Nevada, because the fenfluramine Wanda ingested was shipped to Utah. Because Plaintiffs cannot establish their claims arise out of or relate to Alfa's Nevada activities, the Court need not consider the remainder of the specific jurisdiction test. *See Doe v. Unocal Corp.*,

248 F.3d 915, 925 (9th Cir.2001) (holding court need not consider third "reasonableness" prong because Plaintiff failed to show purposeful availment or but-for relationship between defendant's forum contacts and plaintiff's claims).

### B. General Jurisdiction

"For a defendant to be subject to general *in personam* jurisdiction, it must have such continuous and systematic contacts with the forum that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1391 (9th Cir.1995). "[A] defendant whose contacts are substantial, continuous, and systematic is subject to a court's general jurisdiction even if the suit concerns matters not arising out of his contacts with the forum." *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir.2002) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 n. 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

Plaintiffs contend this Court has general jurisdiction over Alfa because Alfa allegedly sold hundreds of millions of dollars of drug products other than fenfluramine to the United States. Based on Alfa's aggregate sales data to the U.S. and Nevada's population, Plaintiffs project Alfa sold $1.75 million worth of its drugs in Nevada. Plaintiffs also note Alfa hired a U.S. distributor to distribute Alfa's products throughout the entire U.S. Additionally, Plaintiffs contend Alfa is the sole producer of certain drugs in the U.S., consequently they must have sold those drugs in Nevada.

In an effort to conserve the parties' and the Court's time and resources, and because the jurisdictional issue is not enmeshed with the merits of Plaintiffs' case, the Court concludes the best approach is

to decide the jurisdictional question now rather than wait until this complicated and protracted case proceeds to trial. Consequently, the Court will re-open discovery for thirty days on the very narrow issue of whether Alfa, through its distributors, made enough continuous and systematic sales of its products to Nevada to support general jurisdiction. *See Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n. 1 (9th Cir.1977) (noting that a court may permit discovery to aid in determining whether it has in personam jurisdiction, particularly "where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary"). Furthermore, the Court will order that Robert S. Wedinger be deposed within this thirty day period. On May 14, 2004 at 8:30 a.m., the Court will hold an evidentiary hearing at which Plaintiffs must prove by a preponderance of the evidence that the Court has general personal jurisdiction over Alfa. *Data Disc, Inc.*, 557 F.2d at 1285 (district court may order evidentiary hearing to determine jurisdiction at which court will make findings of fact and party asserting jurisdiction must prove jurisdiction by a preponderance of the evidence).

## III. CHOICE OF LAW

Alfa and PCCA both argue Plaintiffs' claims are governed by Utah law. Plaintiffs contend Nevada law controls.

■ When sitting in diversity, a federal court is obligated to apply the substantive law of the forum state in which it sits, including the forum state's choice of law provisions. *Klaxon v. Stentor Elect. Mfg., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Nevada law, the forum's law presumptively governs in a tort case unless another state has an "overwhelming interest." *Motenko v. MGM Dist., Inc.*, 112 Nev. 1038, 921 P.2d 933, 935 (1996). Another state has an

"overwhelming interest" if two or more of the following factors are met: "(a) it is the place where the conduct giving rise to the injury occurred; (b) it is the place where the injury is suffered; (c) the parties have the same domicile, residence, nationality, place of incorporation, or place of business and it is different from the forum state; (d) it is the place where the relationship, if any, between the parties is centered." *Id.*

■ Plaintiffs brought this tort suit in Nevada, therefore Nevada law presumptively governs. Only if Defendants show at least two of the four factors support the conclusion that Utah has an overwhelming interest in this litigation is this presumption overcome.

### A. Place of Conduct Giving Rise to Injury

Defendants argue Utah is the place of conduct giving rise to the injury because the fenfluramine Wanda consumed was shipped to Utah, prescribed by a Utah physician, compounded and dispensed by a Utah pharmacist, and consumed in Utah. Plaintiffs argue this factor does not favor any particular location because the conduct giving rise to the injury was spread out over two countries and four states.

In December 1996, PCCA gave a seminar on compounding drugs in Las Vegas. Koeven the pharmacist was an instructor at this seminar. Fenfluramine potentially was discussed at this seminar given its burgeoning popularity at this time. Alfa manufactured the fenfluramine in Italy. Messeca shipped it from Italy to CPS and HBS in California. CPS and HBS shipped it from California to PCCA in Texas. PCCA then sent it to Koeven's pharmacy in Utah. A Utah physician prescribed the drug to Wanda, she filled that prescription at a Utah pharmacy, and she consumed nearly all those pills in Utah.

While some of the conduct giving rise to the injury occurred in Utah, not all of it occurred there. Utah was just the last stop on a long distribution chain. As to these named Defendants, only PCCA could be said to have engaged in any conduct in Utah. Assuming "conduct" includes not only the origination of the fenfluramine Defendants shipped but also its destination, Alfa's conduct that gave rise to the injury occurred in Italy. Messeca and Sagran's conduct occurred in Italy and California. CPS and HBS's conduct occurred in California and Texas. And PCCA's conduct occurred in Texas and Utah.

Although no conduct giving rise to the injury occurred in Nevada, Nevada's choice of law test is not a straight comparison between Nevada contacts and another state's contacts to see which state has a greater connection to the litigation. Rather, Nevada starts with the presumption that its own law applies and that presumption is overcome only if another state has an overwhelming interest in the litigation. *Motenko*, 921 P.2d at 935. The facts before the Court do not suggest Utah has an overwhelming interest in this litigation. The conduct for which Plaintiffs seek recovery in this suit does not involve any Utah actor nor any actions taken by any Defendant in Utah other than PCCA's importation of the fenfluramine at the end of this multiple-country, multiple-state distribution chain. This factor does not favor the application of the law of any one particular state or country over Nevada law.

### B. Place Where the Injury Is Suffered

Alfa and PCCA argue the injury was suffered in Utah because that is where Wanda consumed the fenfluramine. Plaintiffs argue Wanda also took some of her pills in Nevada. Additionally, Plaintiffs note Wanda will suffer the effects of PPH from this point forward in Nevada. Plaintiffs also argue Scott's loss of consortium claim is being suffered only in Nevada

because Wanda did not become symptomatic until after they moved to Nevada.

The Nevada Supreme Court has interpreted this prong of its choice of law test to mean not just where the injury occurred, but where it is "suffered." In *Motenko*, the Nevada Supreme Court held that although the plaintiff slipped and fell in Nevada, the child's claim for loss of parental consortium would be "suffered" in Massachusetts. *See Motenko*, 921 P.2d at 935 (noting "the second factor is the only factor that supports the use of Massachusetts law because the Motenkos live in Massachusetts and the injury *has been suffered* in that state") (emphasis added); *see also id.* at 940 (Steffen, J. dissenting) (criticizing majority's use of place where injury suffered rather than place where injury occurred: "the majority seemingly interprets their own language to refer to the state where the impact of the injury is most strongly or enduringly felt"). The Nevada Supreme Court reenforced this interpretation in *Northwest Pipe Co. v. Eighth Judicial Dist. Court of the State of Nev.*, 118 Nev. 133, 42 P.3d 244, 245–46 (2002) (noting that the wrongful death injury will be suffered predominantly in Nevada where most of the surviving relatives were living, not in California where the accident victims were killed).

Under *Motenko*'s interpretation of this prong, the injuries in this case will be suffered in Nevada. Wanda moved to Nevada soon after she stopped consuming the fen/phen. She first became symptomatic in 1998 and was not diagnosed with PPH until 2001, well after she became a Nevada resident. She will suffer future effects from PPH in Nevada. Furthermore, Scott will suffer loss of consortium from his wife in Nevada. *See Motenko*, 921 P.2d at 935–36 (in applying choice of law factors, concluding that child suffers loss of parental consortium in state of domicile, not state

where injury occurred). This factor favors applying Nevada law.

### C. Parties Have Same Domicile, Residence, Nationality, etc.

The parties agree this is not a relevant factor in this case.

### D. Place Where the Relationship Between the Parties is Centered

Defendants contend Utah is the place where the parties' relationship is centered because that is where the fenfluramine was compounded, prescribed, and dispensed to Wanda. Plaintiffs contend the parties are so scattered, no specific location is the center of the parties' relationships.

To the extent any place can be identified in this case where the parties' relationship is centered, it is Utah. Utah is the location where all the parties intersect because Utah is where Wanda obtained and consumed Alfa's fenfluramine after PCCA shipped it there. Utah thus may be considered the "center" of their relationship. This factor favors applying Utah law.

Alfa and PCCA have not overcome the presumption that Nevada law applies. Under *Motenko*, Defendants must show at least two of the four factors favor applying another state's law and they must establish that the other state has an overwhelming interest in the litigation. Alfa and PCCA have shown only that the last factor favors applying Utah law. This is not enough under *Motenko* to overcome Nevada's presumption that its own law applies. The Court therefore finds that under Nevada's choice of law test, Nevada law controls this action.

## IV. SUMMARY JUDGMENT

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" demon- strate "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The substantive law defines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All justifiable inferences must be viewed in the light most favorable to the non-moving party. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir.2001).

The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir.2000). The burden then shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating there is a genuine issue for trial. *Id.; Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

### A. Statute of Limitations

■ Defendant PCCA argues the statute of limitations has run on Plaintiffs' claims. According to PCCA, Utah law provides only two years in which to bring suit and Plaintiffs should have discovered Wanda's injuries either when all the publicity about fen/phen occurred in 1997, or when Wanda became symptomatic in 1998. Plaintiffs argue that even if the Utah statute of limitations applied, Wanda did not know she had PPH until she was diagnosed in 2001.

Nevada has a four year statute of limitations for products liability cases. Nev. Rev.Stat. 11.220 (statute of limitations for actions not specifically provided for in other sections). Nevada also recognizes the discovery rule. *Bemis v. Estate of Bemis*, 114 Nev. 1021, 967 P.2d 437, 440 (1998). Under that rule, "the statutory period of limitations is tolled until the injured party

discovers or reasonably should have discovered facts supporting a cause of action." *Id.*

PPH is a progressive disease that may not become symptomatic or capable of diagnosis for several years. On November 15, 2000, Wanda had an echocardiogram to examine her for post-fen/phen heart problems but she was not diagnosed with PPH at that time. (Exs. to Pls.' Opp'n, Ex. 12.) A doctor did not diagnose her with PPH until May 2001. She promptly filed suit within two months thereafter. Under these facts, Plaintiffs have demonstrated, at a minimum, a genuine issue of fact regarding whether Plaintiff knew or should have known she had an injury from her fen/phen use prior to May 2001.[3] The Court will deny Defendant PCCA's motion for summary judgment on the statute of limitations.

### B. Comment k

Comment k to section 402A of the Restatement (Second) of Torts on products liability deals with "unavoidably unsafe products." Comment k suggests that a drug manufacturer should not be held liable for adverse consequences arising out of the use of its drugs if: (1) the manufacturer supplies the public with an apparently useful and desirable product, attended by a known but apparently reasonable risk, (2) the drug is properly prepared and marketed, and (3) the drug is accompanied by proper directions and warnings. Defendants claim they meet these requirements and that Utah recognizes the defense. Plaintiffs contend Nevada does not recognize this defense and Defendants do not meet the defense's requirements in any event.

■ Nevada has rejected comment k. *See Allison v. Merck and Co., Inc.*, 110 Nev. 762, 878 P.2d 948 (1994). In *Allison*, the plaintiff sued drug manufacturer Merck for a mumps vaccine that caused brain damage in her child. The vaccine was administered without warnings of the possibility of brain damage. Merck attempted to raise a comment k defense, but the Nevada Supreme Court rejected the defense:

> It is not easy to divine just why the framers of the comment thought that a drug manufacturer should be excused in cases in which it manufactured a drug that was "known" to be dangerous. The whole idea behind strict tort liability is that the manufacturer, not the consumer, should bear the responsibility for injuries, even when the product is ostensibly properly prepared and marketed and when the plaintiff is not in a position to prove the origin of the defect.

*Id.* at 954. Rather, the Nevada Supreme Court ruled that where a drug manufacturer dispenses a drug with appropriate warnings and the consumer chooses to take the drug in the face of the known warnings, a manufacturer is not liable. *Id.* But the Supreme Court stated that is "not because of the 'unreasonably dangerous' doctrine proposed by comment k, but, rather, because the victim chooses to be injected with a drug having known 'damaging consequences' rather than to die from [a disease the drug is aimed at treating]." *Id.*

Because Nevada has explicitly rejected the comment k defense, the Court will deny Defendants' motions for summary judgment on this issue.

---

**3.** Even if Utah law applied, the result would be the same. Utah requires plaintiffs to bring their action "within two years from the time . . . the claimant in such action discovered, or in the exercise of due diligence should have discovered, both the harm and its cause." Utah Stat. 78–15–3. This statute applies to claims against a manufacturer for defective products. *Strickland v. General Motors Corp.,* 852 F.Supp. 956, 959 (D.Utah 1994).

## C. Bulk Supplier Doctrine

Defendants next argue they both are shielded from liability by the bulk supplier doctrine. Defendants contend they are bulk suppliers of the active pharmaceutical ingredient fenfluramine and thus they had no duty to warn because the intermediary manufacturer that uses Defendants' raw materials to make a new product bears the burden of delivering any necessary warnings. Plaintiffs argue Nevada has not recognized the bulk supplier defense. Plaintiffs also argue that even if Nevada recognized the defense, Alfa and PCCA are not bulk suppliers, nor did they ensure their vendees were knowledgeable intermediaries. Additionally, Plaintiffs argue Alfa is the only manufacturer so there is no second product in which fenfluramine is just a raw material. Finally, Plaintiffs argue that PCCA substantially participated in the compounding of the fenfluramine such that they were not just a supplier of bulk raw material.

According to the bulk supplier doctrine, a "bulk supplier of raw materials which are not themselves inherently dangerous has no duty to warn ultimate users of the manufactured product." *House v. Armour of Am., Inc.*, 886 P.2d 542, 554–55 (Utah App.1994) (bulk supplier of KEVLAR had no duty to warn the ultimate vest user about the levels of protection afforded by vests woven from KEVLAR). A federal district court for the district of Nevada described the doctrine as follows: "a bulk supplier who supplies a dangerous product to a sophisticated purchaser cannot be held liable for not warning the ultimate users of the product of its dangers." *Forest v. E.I. DuPont de Nemours and Co.*, 791 F.Supp. 1460, 1465 (D.Nev.1992).

Nevada has neither accepted nor rejected the bulk supplier doctrine in any form. In *Forest,* the court ruled that Nevada would adopt the bulk supplier doctrine in some form. *Id.* The *Forest* court noted the policy reasons supporting the doctrine: the intermediary is in a better position to warn the ultimate consumer of dangers than is the bulk supplier; warnings by the bulk supplier attached to large deliveries could not reasonably be expected to reach the ultimate consumer; and the bulk supplier usually has no control over the marketing, labeling, and distribution of the final product. *Id.*

Although concluding Nevada would adopt the bulk supplier doctrine, the *Forest* court concluded:

> Certainly, any useful version of the bulk supplier doctrine would require the bulk supplier to be reasonably sure that its vendee knew of the dangers inherent in the supplier's bulk product and planned to warn users about them. Once the vendee/intermediary had the requisite knowledge, it could then fulfill its own duties to the consumer or user.

*Id. Forest* held that a defendant seeking to benefit from the defense would "have to show that it reasonably relied upon [the sophisticated purchaser's] knowledge of the risks involved with using [the raw material] and that it also reasonably relied upon [the sophisticated purchaser] to warn [the ultimate consumers] of those dangers." *Id.* at 1467. *Forest* held a defendant could meet this burden by proving "it took some reasonable, affirmative steps to ascertain that [the sophisticated purchaser] was a knowledgeable intermediary." *Id.*

██  Plaintiffs argue Nevada would not adopt the bulk supplier doctrine because no Nevada court has adopted it nor cited *Forest.* Furthermore, in *Allison,* decided after *Forest,* Nevada Supreme Court indicated that "although a manufacturer may decide to assign its duty to warn of the unsafeness of its product to others, a manufacturer cannot be relieved of ultimate responsibility for assuring that its unsafe

product is dispensed with a proper warning." *Allison*, 878 P.2d at 959.

■ Even assuming Nevada would adopt the bulk supplier theory in some form, it does not appear that either Alfa or PCCA would, as a matter of law, be shielded from liability under this defense. Using Utah's formulation of the rule that bulk suppliers of raw materials which are not themselves inherently dangerous has no duty to warn, a genuine issue of material fact remains regarding whether fenfluramine is an inherently dangerous raw material about which the bulk supplier would be required to warn. As early as 1995, fenfluramine was associated with pulmonary hypertension risks. (Exs. to Pls.' Opp'n, Exs. 18, 26, 27.)

Additionally, the *Forest* court's formulation of the rule would require the bulk supplier to take reasonable affirmative steps to ensure it was selling to a sophisticated purchaser who would pass on those warnings to end users. Defendants have not identified any evidence of steps either entity took to ensure their "sophisticated purchasers" knew of fenfluramine's dangers. Rather, it is undisputed that Alfa and PCCA did not issue any warnings to any other party about potential dangers associated with the human consumption of fenfluramine. (Exs. to Pls.' Opp'n, Ex. 2 at 91–92, 95–96; Ex. 34 at 11–12, 43.) Nor have PCCA or Alfa identified any evidence they took steps to ensure their "sophisticated buyers" were passing on any warnings to consumers. Indeed, PCCA conceded that compounded fen/phen could reach the consumer without any written warnings whereas consumers taking a manufactured fenfluramine tablet would have received written warnings from the manufacturer. (Exs. to Pls.' Opp'n, Ex. 2 at 95–96.) Consequently, the Court will deny Defendants' motion for summary judgment on this issue.

### D. Learned Intermediary Doctrine

■ Under the learned intermediary doctrine, "manufacturers of prescription drugs have a duty to warn only the physician prescribing the drug, not the end user or patient." *Schaerrer v. Stewart's Plaza Pharmacy, Inc.*, 79 P.3d 922, 928 (Utah 2003). "A manufacturer will be held directly liable to the patient for breach of the duty to make timely and adequate warnings to the medical profession of any dangerous side effects produced by its drug of which it knows or has reason to know." *Id.* "The physician, after having received complete and appropriate warnings from the drug manufacturer, acts as a learned intermediary between the manufacturer and the patient." *Id.* The physician is best situated to weigh the potential risks associated with a prescription drug against the possible benefits of the drug and the unique needs and susceptibilities of each patient, and thus is the best conduit for any necessary warnings. *Id.* at 928–29.

Nevada has not expressly adopted or rejected the learned intermediary doctrine. Nevada has mentioned the learned intermediary doctrine only once in *Allison*, 878 P.2d at 968–69, and in that case, only in dissent.

The federal district court for the district of Nevada previously has ruled that the learned intermediary doctrine would not apply in Nevada, at least not with respect to a pharmacist. *See Gennock v. Warner–Lambert Co.*, 208 F.Supp.2d 1156, 1159 (D.Nev.2002). In *Gennock*, Plaintiff filed suit against manufacturers and a pharmacist. The claim against the pharmacist destroyed diversity jurisdiction. On a motion to remand, the district court ruled that the learned intermediary doctrine did not shield the pharmacist from liability and hence he was not fraudulently joined. *Id.* ("At a minimum, a pharmacist must be

held to a duty to fill prescriptions as prescribed and properly label them (including warnings) and be alert for plain error.").

Although the learned intermediary doctrine frees the manufacturer from warning the end user, the manufacturer still must warn the learned intermediary. *Schaerrer*, 79 P.3d at 928 (describing the duty under the learned intermediary doctrine as "*a duty to warn only the physician prescribing the drug*, not the end user or patient") (emphasis added). *Allison* strongly indicates that if Nevada adopted the doctrine, Nevada would require as one element of the defense that the manufacturer warn the physician or other learned intermediary, even if it need not warn the ultimate consumer. *Allison*, 878 P.2d at 959 (concluding a manufacturer may assign its duty to warn but it is not relieved of the ultimate responsibility for assuring that its unsafe product is dispensed with a proper warning).

Here, even if the Court assumed Nevada would adopt the learned intermediary doctrine, Defendants would not, as a matter of law, be shielded from liability under the defense. It is undisputed neither PCCA nor Alfa gave any warnings to the pharmacist Koeven, Dr. Brinton, or anyone else who might qualify as a learned intermediary in this case. The Court therefore will deny Defendants' motion for summary judgment on this issue.

*E. Pervasive Regulation by FDA*

PCCA and Alfa argue that FDA pervasively regulates drug distribution and because FDA does not require suppliers of bulk pharmaceutical ingredients to include warnings on labels, the FDA regulations preempt Plaintiffs' claims. Plaintiffs argue FDA labeling requirements do not preempt state law claims for strict products liability. Additionally, Plaintiffs argue Alfa and PCCA cannot hide behind FDA regulations because both companies violated FDA regulations by selling to consumers fenfluramine marked for research and development purposes only, and by importing fenfluramine in contravention of FDA's ban on Messeca and PCCA importing bulk foreign chemicals. Plaintiffs also point out that Alfa's own expert, O'Reilly, conceded that compliance with FDA regulations is not an automatic defense to strict liability claims. (Pls.' Opp'n, Ex. 21 at 33.)

Pursuant to federal law all prescription drugs must be labeled according to Food, Drug and Cosmetic Act requirements. 21 U.S.C. § 825. Suppliers of bulk pharmaceutical ingredients are specifically exempted from these labeling requirements. *See* 21 U.S.C. § 353(a) (directing secretary to promulgate regulations "exempting from any labeling or packaging requirements of this chapter drugs which are, in accordance with the practice of the trade, to be processed, labeled or repacked in substantial quantities at establishments other than those where originally processed or packed ...."); 21 C.F.R. § 201.122 (regulation exempting bulk suppliers from labeling requirements).

■■■■ The Court agrees with the weight of authority on this issue that FDA labeling regulations do not preempt state common law products liability claims.[4]

---

**4.** *See Salmon v. Parke, Davis & Co.*, 520 F.2d 1359, 1362 (4th Cir.1975); *Brochu v. Ortho Pharm. Corp.*, 642 F.2d 652, 658–59 (1st Cir. 1981); *Stephens v. G.D. Searle & Co.*, 602 F.Supp. 379, 382 (E.D.Mich.1985); *Skill v. Martinez*, 91 F.R.D. 498, 508 (D.N.J.1981); *MacDonald v. Ortho Pharm. Corp.*, 394 Mass. 131, 475 N.E.2d 65, 70–71 (1985); *Feldman v. Lederle Labs.*, 97 N.J. 429, 479 A.2d 374, 383 (1984); *Mahr v. G.D. Searle & Co.*, 72 Ill.App.3d 540, 28 Ill.Dec. 624, 390 N.E.2d 1214, 1229 (Ill.App. 1 Dist.1979); *Ortho Pharmaceutical Corp. v. Chapman*, 180 Ind.App. 33, 388 N.E.2d 541, 554 (1979); *Michael v. Warner/Chilcott*, 91 N.M. 651, 579 P.2d 183, 186 (N.M.App.1978); *Whitley v. Cubberly*, 24 N.C.App. 204, 210 S.E.2d 289, 292 (1974); *McEwen v. Ortho Pharm. Corp.*, 270 Or. 375, 528 P.2d 522, 533–34 (1979); *Stevens v.*

Generally with respect to preemption, there is a presumption against federal law preempting state law unless Congress expressly states its intent. *Pac. Gas and Elec. Co. v. Cal. ex rel. Cal. Dep't of Toxic Substances Control,* 350 F.3d 932, 943 (9th Cir.2003). This presumption is even stronger with respect to state or local regulation of matters related to health and safety. *Chem. Specialties Mfrs. Ass'n, Inc. v. Allenby,* 958 F.2d 941, 943 (9th Cir. 1992). Congress did not expressly state an intent to preempt state products liability claims. Congress knew how to enact a specific preemption provision as it did with respect to medical devices. *See* 21 U.S.C. § 360k ("no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement ... which is different from, or in addition to, any requirement applicable under this chapter to the device, and ... which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter."). But Congress did not include a similar preemption provision for prescription drugs. *See Caraker v. Sandoz Pharms. Corp.,* 172 F.Supp.2d 1018, 1035 (S.D.Ill.2001). Had Congress intended for FDA labeling regulations to preempt state failure to warn claims, it would have made explicit such a drastic change in the law.

Furthermore, the Court finds Defendants cannot take advantage of FDA labeling regulations when genuine issues remain as to whether Defendants violated those regulations. Plaintiffs have presented evidence that Defendants violated FDA labeling regulations by selling for consumer use fenfluramine that was marked for research and development only, and by circumventing FDA bans on PCCA and TopChem from importing foreign bulk

pharmaceutical ingredients. (*See, e.g.,* Exs. to Pls.' Opp'n, Ex. 4 at 49–52, 89–92; Exs. to Alfa's Mot., Exs. I, L at 23, 68, 96; M, N.).

The Court therefore will deny Defendants' motions for summary judgment on this issue.

### F. Negligent Misrepresentation, Fraudulent Concealment, Punitive Damages

Alfa moves for summary judgment on the merits of Plaintiffs' negligent misrepresentation, fraudulent concealment, and punitive damages claims. Unless the Court has jurisdiction over Alfa, the Court has no power to decide these claims. Consequently, the Court will not address these issues until the jurisdictional issue is resolved. Should the Court determine after the evidentiary hearing that it has personal jurisdiction over Alfa, the Court will revive Alfa's motion at that time without further briefing from the parties.

## V. CONCLUSION

IT IS THEREFORE ORDERED that Defendant PCCA's Motion for Summary Judgment (Doc. # 188) is hereby DENIED.

IT IS FURTHER ORDERED that Motion for Summary Judgment of Defendant Alfa Chemicals Italiana (Docs.# 189) is hereby DENIED with respect to all issues except personal jurisdiction and the negligent misrepresentation, fraudulent concealment, and punitive damages claims.

IT IS FURTHER ORDERED that the Court will stay its decision on Alfa's Motion for Summary Judgment with respect to negligent misrepresentation, fraudulent concealment, and punitive damages until

*Parke, Davis & Co.,* 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653, 661 (1973); *Bristol–Myers*

Co. v. Gonzales, 561 S.W.2d 801, 804 (Tex. 1978).

after the Court decides the jurisdictional issue.

IT IS FURTHER ORDERED that discovery is re-opened for thirty days from the date of this Order on the sole issue of Alfa's amenability to general personal jurisdiction in this Court.

IT IS FURTHER ORDERED that Plaintiffs shall take the deposition of Robert S. Wedinger within thirty days from the date of this Order.

IT IS FURTHER ORDERED that this matter shall be placed on calendar in Courtroom # 7C on May 14, 2004 at 8:30 a.m. for an evidentiary hearing on Alfa's amenability to general personal jurisdiction in this Court.